## UNITED STATES v. CERTAIN LANDS SITUATE IN BOROUGH OF BROOKLYN, KINGS COUNTY, N. Y., et al.

### C. P. No. 3.

District Court, E. D. New York.

Feb. 25, 1946.

Harry T. Dolan, Sp. Asst. to Atty. Gen. of United States, for petitioner-plaintiff.

Samuel Goldstein, of Brooklyn, N. Y., for defendant Rosa Martorelli.

KENNEDY, District Judge.

On September 2, 1942, the United States of America began this proceeding to acquire a parcel of land on Cropsey Avenue at the intersection of Canal Avenue. By an amendment the amount of land sought to be taken was increased to 12,526 square feet, the parcel having a frontage of 91.37 feet on Cropsey Avenue, 148.98 feet on Canal Avenue, and an average depth of approximately 125 feet. The Declaration of Taking was filed with the clerk of this court on May 18, 1943.

The only question to be determined is the fair market value of the property on September 2, 1942.

Prior to the taking the property was used as a filling station and automobile repair shop. At the time that I viewed it on May 21, 1945 all that remained of the structures formerly on the property was a hummock of land bounded by Canal Avenue and Cropsey Avenue, on which there was erected a wooden floor with wooden supports. The property in suit is Lot No. 325, in Block 6997-C of the Land Map of the County of Kings. When one comes off the Belt Parkway, going in a southerly direction (toward Coney Island) the subject property is the first parcel that one passes on the easterly side with the exception of two irregularly shaped parcels (Block 6951 and Block 6952) which lie between Canal Avenue (at the northerly boundary of the subject property), and the Belt Parkway itself.

 A considerable portion of the land in that area was acquired by Wheeler Shipyard, Inc. (hereinafter referred to as "shipyard" or "Wheeler"), and one of the principal points debated at the trial was the proper method of analyzing certain sales in Blocks 6951 and 6952 whereby a number of these parcels came into the ownership of Wheeler. While other criteria of fair market value were discussed by both sides, it is practically on these sales alone that claimant attempts to justify a fair market value for the subject property of $2.50 per square foot which, after the application of increments for corner influence and plottage, brings her claim to $37,196 for the land alone. To this claimant adds the value of improvement ($4,750) and the value of a gasoline permit ($15,000), making her total claim $56,946. The Government on the other hand assigns a value to the subject property of 90 cents per square foot which includes an allowance for corner influence and plottage. Adding $3,000 for the value of improvements, the Government arrives at a total value of $14,250 (one expert said the total value was slightly higher: $15,-000). While I am fully conscious of the duty upon experts to take into consideration all sales of surrounding property it is clear to me that the so-called Wheeler sale (Blocks 6951 and 6952) affords no reasonable or proper basis of fair market value. The shipyard was assembling property to expand its then existing facilities, which were in that immediate area. To do this it bought up a number of parcels ranging from 5 square feet to 5,020 square feet, the majority of which were very small in extent. Improvements on the properties thus acquired were of no moment or concern to the shipyard so long as it got the land which apparently it simply had to have.

In analyzing these sales claimant's expert deducted the assessed value of the building from the purchase price. The assessed value of the land itself he simply left out of consideration. In this way he developed unit values in Block 6951 ranging from 82½ cents a square foot to $3.84 a square foot. In Block 6952 his unit value ranged from 39 cents a square foot to $1.27½ per square foot. I think that on the face of it this wide variation shows that the sales ought not to be trusted.

The Government's expert on the other hand applied against these sales the ratio between the assessed value of the buildings and the total assessed values of the properties. He concluded that the proper overall unit for Block 6951 was $1.29 per square foot, subject to deductions for corner influence and short lots, and that in Block 6952 the average overall unit price was

properly 69 cents per square foot. Taking the two blocks together he arrived at a unit of $1.06 per square foot for the total assembly.

Claimant's expert paid scarcely any attention to sales other than the so-called Wheeler sales; the Government on the other hand took into consideration a number of others in the vicinity. These yielded unit prices ranging from 68 cents to $1.02 per square foot, and no matter how these sales are approached, analyzed or interpreted, it is impossible on the basis of these to arrive at a value for the subject property of greater that $1 per square foot. This, it will be observed, confirms the theory that the Wheeler sales, while not to be wholly ignored, should not be considered reliable guides to value.

■ When the subject of value was approached from the standpoint of rentals a similar wide divergence appeared in the testimony, but this time for a different reason. On the subject property there were, as I have said, a gasoline filling station, a store and apartment, and some structures which the Government calls sheds and the claimant calls an automobile repair shop. Concerning the structures last named, the claimant says the rental value was $1,200 per annum. The Government says they could be considered only in connection with the filling station and had no separate rental value. There is not very wide disparity between the parties about what could be realized from the rent of the apartment. But the claimant says that the gasoline filling station, together with the store, should bring $2,700 per annum and the Government says the fair rental value of the filling station and automobile repair shop together is $900 per annum (incidentally it will be observed that just as the claimant's fee value is approximately three times that put forward by the Government, so is its rental value). Claimant does not pretend to be able to support the rental value by any actual transactions. The figure of $2,700 per annum is arrived at by assuming that a filling station in that area, in normal times, and in the absence of any restrictions such as gasoline rationing, would dispose of 180,000 gallons of gasoline per annum. And allowing 1½ cents per gallon in the way of rental the annual revenue from this source therefore becomes $2,700 per annum.

The Government on the other hand exhibits figures to show that the average gallonage actually sold by the operators of the filling station was in the neighborhood of 40,000 gallons per year and therefore even assuming that given other sources of supply, the operators could have disposed of more, the average volume would not exceed 60,000 gallons per annum. Applying the same figures as used by the owner's experts (1½ cents a gallon) this furnishes a fair rental value of $900 per annum. Again it seems to me that the Government is basing its valuation upon a firm foundation, and claimant is using a very shaky one.

■ Even more questionable is the claimant's assumption that an item of $15,000 for the value of the gasoline permit should be included in any estimate of the value of this land. Supposing good will to be a permissible item in value, there is simply nothing to show that the business history of this filling station would warrant the inclusion of that amount, or any amount, as the value of the permit. True enough, there is a suggestion in the record that by the custom of the trade when a filling station has consistently sold gasoline in excess of 100,000 gallons per gallon it is usual to add to the sales price of the premises an additional consideration arising from this fact. But one of claimant's experts subscribed to the existence of this custom in a manner that can only be called half-hearted, and in the case at bar there is nothing on the basis of which one could say that certainly this was an element in the fair market value of the property taken. On the contrary all the evidence established that the rental value of filling stations in this area, as well as others, were consistently shrinking.

■ Since the burden of proof on the issue of value is clearly on the claimant I have no choice except to use guides to value which are reasonably reliable, supplemented by such benefit as I derived from looking at the property itself and adjacent properties.

It is my conclusion that a proper unit of value for the premises taken is $1 per square foot, which includes an allowance for corner influence and plottage. I believe that the value of the improvements on the property, at the time of the taking, was $3,000 and therefore the claimant is entitled to a total award of $15,526. I have paid no attention whatever to the fact that in the course of an assessment proceeding the Supreme Court of Kings County fixed a value of $9,000 for some apparently substantial portion of the subject property. This is not

binding, even if conditions were precisely the same, which they are not.

### Conclusion

I conclude that on September 2, 1942, the fair market value of the property, which is the subject of this proceeding, was as follows:

Land, at a unit value of $1. per
square foot ................ $12,526.00
Value of Improvements........ 3,000.00
 _____
 $15,526.00

Submit decree.